IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

JAMEY PAUL BURRAGE                                                          PLAINTIFF

v.                                                        No.  4:22CV136-DAS

MISSISSIPPI STATE PRISON, ET AL.                                          DEFENDANTS

MEMORANDUM OPINION

This matter comes before the court on the *pro se* prisoner complaint of Jamey Paul Burrage,

who challenges the conditions of his confinement under 42 U.S.C. § 1983.  For the purposes of the

Prison Litigation Reform Act, the court notes that the plaintiff was incarcerated when he filed this suit.

The plaintiff has brought the instant case under 42 U.S.C. § 1983, which provides a federal cause of

action against "[e]very person" who under color of state authority causes the "deprivation of any

rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983.  The

plaintiff alleges that the defendants failed to protect him from sexual assault by his cell mate, then

failed to move him to another location when he requested.

First, the court issued an order [14] for the plaintiff to show cause why the following

defendants should not be dismissed from this case:  Mississippi State Prison (not a valid defendant),

all of C.I.D. (11th Amendment immunity), Warden Munford (no personal involvement in the incident),

and Superintendent Marc McClure (not liable as a supervisor).  The plaintiff did not show cause as to

Mississippi State Prison, all of C.I.D., or Superintendent Marc McClure; as such, those defendants

will be dismissed with prejudice from this case for failure to state a valid § 1983 claim against them.

However, in his response [21] to the show cause order, the plaintiff alleged that Munford failed to

relocate him after the assault, even though mental health officials recommended that he be moved. This allegation states a claim against defendant Munford, who will remain in the case.[1]

Defendants Sargent Bradford, Officer Douglas, Renita Hands, and Mr. Honeycutt have moved [52] for summary judgment, arguing that the instant case should be dismissed because the plaintiff failed to exhaust his administrative remedies before filing suit. Burrage has responded; the defendants have replied, and the matter is ripe for resolution. For the reasons set forth below, the motion [52] by the defendants for summary judgment will be granted, and this case will be dismissed without prejudice for failure to exhaust administrative remedies.

## Consent to Magistrate Judge Jurisdiction

The plaintiff and the defendants who have been served in this case have consented to jurisdiction by a Magistrate Judge under 28 U.S.C. § 636(c). Doc. 6 (plaintiff's consent form); Doc. 61 (Defendants' consent form). Section 636(c) reads, in relevant part:

> **(1)** Upon the consent of the parties, a full-time United States magistrate judge … may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case, when specially designated to exercise such jurisdiction by the district court or courts he serves ….
>
> **(2)** If a magistrate judge is designated to exercise civil jurisdiction under paragraph (1) of this subsection, the clerk of court shall, at the time the action is filed, notify the parties of the availability of a magistrate judge to exercise such jurisdiction. The decision of the parties shall be communicated to the clerk of court. Thereafter, either the district court judge or the magistrate judge may again advise the parties of the availability of the magistrate judge, but in so doing, shall also advise the parties that they are free to withhold consent without adverse substantive consequences. Rules of court for the reference of civil matters to magistrate judges shall include procedures to protect the voluntariness of the parties' consent.

28 U.S.C.A. § 636(c)(1) and (c)(2). Under § 636(c)(1), the Magistrate may exercise jurisdiction if the parties who have been served with process consent to Magistrate Judge jurisdiction; unserved parties

---

[1] The following defendants have not been served with process: Mississippi State Prison, all of C.I.D., Superintendent Marc McClure, and Warden Munford.

need not consent. *Neals v. Norwood*, 59 F.3d 530, 532 (5th Cir. 1995). In this case, defense counsel accepted process on behalf of defendants Hands, Bradford, Douglas, and Honeycutt. Doc. 6 (Process and Scheduling Order), Doc. 27 (Answer). Counsel did not accept service of process for the other defendants, who were not otherwise served and thus have not appeared in the case; as such, those defendants need not consent for Magistrate Judge jurisdiction. Doc. 15. As such, the Magistrate Judge may exercise jurisdiction over this case.

### Summary Judgment Standard

Summary judgment is appropriate if the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) and (c)(1). "The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden." *Beck v. Texas State Bd. of Dental Examiners*, 204 F.3d 629, 633 (5th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), *cert. denied*, 484 U.S. 1066 (1988)). After a proper motion for summary judgment is made, the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby,* Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Beck*, 204 F.3d at 633; *Allen v. Rapides Parish School Bd.*, 204 F.3d 619, 621 (5th Cir. 2000); *Ragas v. Tennessee Gas Pipeline Company*, 136 F.3d 455, 458 (5th Cir. 1998).

Substantive law determines what is material. *Anderson*, 477 U.S. at 249. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*, at

248.  If the non-movant sets forth specific facts in support of allegations essential to his claim, a genuine issue is presented.  *Celotex*, 477 U.S. at 327.  "Where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 89 L. Ed. 2d 538 (1986); *Federal Savings and Loan, Inc. v. Krajl*, 968 F.2d 500, 503 (5th Cir. 1992).

The facts are reviewed drawing all reasonable inferences in favor of the non-moving party. *Allen*, 204 F.3d at 621; *PYCA Industries, Inc. v. Harrison County Waste Water Management Dist.*, 177 F.3d 351, 161 (5th Cir. 1999); *Banc One Capital Partners Corp. v. Kneipper*, 67 F.3d 1187, 1198 (5th Cir. 1995).  However, this is so only when there is "an actual controversy, that is, when both parties have submitted evidence of contradictory facts."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994); *see Edwards v. Your Credit, Inc.*, 148 F.3d 427, 432 (5th Cir. 1998).  In the absence of proof, the court does not "assume that the nonmoving party could or would prove the necessary facts." *Little*, 37 F.3d at 1075 (emphasis omitted).

### Undisputed Material Facts

At all relevant times, Jamey Paul Burrage was an inmate in the custody of the Mississippi Department of Corrections ("MDOC") and housed at the Mississippi State Penitentiary ("MSP" or "Parchman").  He filed this *pro se* prisoner civil action under 42 U.S.C. § 1983 alleging violations of his constitutional rights.  Doc. 1.

On or about July 24, 2022, Burrage sent a grievance to MDOC's Administrative Remedy Program ("ARP") regarding the alleged sexual assault.  See Collective Ex. 1.[2]  In his grievance, Burrage alleged that he "told Lt. Honeycutt that my roommate . . . cell # 19 29G-B117 was making

---

[2] The exhibits referenced in this memorandum opinion may be found attached to the defendants' motion for summary judgment.

me do sexual things to him." *Id*. Burrage requested "to be in a cell by myself" and to be "moved off this dorm where I can be safe." *Id*. The grievance did not, however, make it to the Administrative Remedy Program at that time.[3]

On July 26, 2022, Burrage was moved to medical for an evaluation. Collective Ex. 2. On July 27, 2022, Delma Forest Elem, the PREA Manager, was notified of a possible PREA incident with Burrage, and she launched an investigation. Ex. 2. As a result of the investigation, the PREA allegations were determined to be unfounded, and the incident was closed. *Id*.

On August 25, 2022, *before Burrage received a response to his grievance* (which, unbeknownst to him, had been lost), he filed the instant suit. Doc. 1. All of his allegations in his complaint arise out of the July 23, 2022, incident. Doc. 1, p. 4-5. In his prayer for relief, Burrage seeks $1,000,000 in damages and to be transferred to another facility. Doc. 1, p. 5.

On September 26, 2022, Burrage sent a letter to the ARP Director inquiring about the status of the July 24, 2022, grievance. It appears that the letter included a copy of the July grievance, which the ARP Office had not previously received. On October 3, 2022, in accordance with MDOC SOP 20-08-01 (discussed in detail below), the ARP Director forwarded Burrage's letter to the Corrections Investigation Division ("CID"). Ex. 3. In an October 3, 2022, letter from the ARP Director, Burrage was informed that CID would investigate his allegations concerning the July 23, 2022, incident. *Id*. The letter also noted that *Burrage could not proceed with the grievance process until the CID investigation concluded*:

> I have forwarded your letter to CID Chief John Hunt in order for CID to conduct an investigation into your allegations. You should contact him or his team only with questions or concerns regarding this issue.

---

[3] However, as set forth below, the ARP Director did receive the grievance on October 3rd – when Burrage inquired about its status.

> If you are not satisfied with CID's results at the completion of their investigation, you may submit your complaint, along with proof of completion, to the ARP office at your housing facility for consideration.

Doc. 52-3 at 3. Thus, Burrage was informed that the ARP grievance process had not begun – and could not begin until CID completed its investigation. Burrage signed for the October 3rd letter on October 12, 2022. *Id*. That same day he submitted another grievance (*after* filing the instant suit) to the ARP regarding the July 23rd incident – and requested to be transferred to another facility. Ex. 3.

On October 17, 2022, the ARP Director notified Burrage that the Administrative Remedy Program had not received the original July 24 grievance:

> I am in receipt of your correspondence concerning ARP; however, this office has no record of receiving such correspondence from you around the date of July 24, 2022. ARP cannot address an ARP that was not received. The only ARP submitted were dental concerns – [ARP No.] MSP-22-665.

Doc. 57-1 at 5.

Burrage filed a "Motion to Be Allowed to Move Forward with Case without Seeking Relief from (ARP) Administrative Remedy Program System" in the instant case on October 27, 2022 (an acknowledgment that he had not completed the ARP process before filing suit). Doc. 26. He filed another ARP grievance concerning the incident on November 3, 2022 (again – *after* filing the instant suit). In a November 17, 2022, letter, ARP Director Pennington informed Burrage that the latest grievance was placed on backlog while one or more other grievances were being processed:

> Your request for Administrative Remedy concerning conflict with staff and inmates to be moved. However, it is noted that this complaint will be placed in this Backlog. Only one ARP will be processed at a time.
>
> Therefore, your most recent request for Administrative Remedy has been backlogged for handling in due course. If you wish to have your request handled now through the Administrative Remedy Program, you may withdraw (in writing) all pending ARP's.

Doc. 57-1 at 12. The record does not reveal the grievance numbers or content of the pending grievance or grievances ahead of the November 3rd grievance in the queue.

Burrage was transferred to the Marshall County Correctional Facility sometime on or before November 28, 2022. Docs. 33 and 38.[4] In a December 8, 2022, letter, ARP Director Pennington informed Burrage that his request was granted, as he had been transferred from the Mississippi State Penitentiary, as requested:

> ARP is in response to your correspondences [regarding] a transfer due to conflict with staff and inmates. Your request has been granted, you are now housed at Marshall CCF. Therefore, your request is being filed.

Doc. 57-1 at 14 (emphasis added).

Initially, the medical, mental health, and CID authorities investigating Burrage's sexual assault allegations received notice of them shortly after the alleged attack of July 23, 2022, and acted expeditiously to investigate them. However, the ARP Director did not receive a copy of Burrage's July 24, 2022, grievance at that time. The mishandling of the initial grievance caused a significant delay in processing Burrage's allegations through the ARP (though the allegations were investigated promptly by medical staff, mental health staff, and the PREA Manager). It is unclear whether the October CID investigation was completed – and, if so – whether Burrage submitted an ARP grievance afterwards – which would have been his first opportunity to start the grievance process.[5] Nonetheless, no one disputes that Mr. Burrage filed the instant case before *any* of the three grievances were resolved, and as discussed below, the outcome of the case turns on that fact.

### The Mississippi Department of Corrections ARP Grievance Process

Under the Prison Litigation Reform Act, a *pro se* prisoner plaintiff must exhaust his

---

[4] As Burrage was moved to the Marshall County Correctional Facility, his request for a transfer has become moot. *See Herman v. Holiday*, 238 F.3d 660, 665 (5th Cir. 2001) (transfer of inmate away from the facility where his claims arose renders his request for injunctive relief moot).

[5] In any event, Burrage received the relief he sought – transfer away from his alleged attacker – though not through the grievance process – which had never been initiated.

administrative remedies before filing the instant suit:

> No action shall be brought with respect to prison conditions under [42 U.S.C.§ 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other prison until such administrative remedies as are available are exhausted.

*See* 42 U.S.C. § 1997e(a). Congress enacted the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e *et seq.* – including its requirement that inmates exhaust their administrative remedies prior to filing suit – in an effort to address the large number of prisoner complaints filed in federal courts. *See Jones v. Bock*, 549 U.S. 199, 202 (2007). Congress created the exhaustion requirement to weed out the frivolous claims from the colorable ones. *Id*. at 203. Thus, the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e(a), requires prisoners to exhaust any available administrative remedies before filing suit under 42 U.S.C. §1983.

The exhaustion requirement protects administrative agency authority, promotes efficiency, and produces "a useful record for subsequent judicial consideration." *Woodford v. Ngo*, 548 U.S.81, 89 (2006). A prisoner cannot satisfy the exhaustion requirement "by filing an untimely or otherwise procedurally defective administrative grievance or appeal" because "proper exhaustion of administrative remedies is necessary." *Woodford v. Ngo*, 548 U.S. 81, 83-84 (2006); see also *Johnson v. Ford*, 261 F. App'x 752, 755 (5th Cir. 2008)( the Fifth Circuit takes "a strict approach" to the PLRA's exhaustion requirement)(*citing Days v. Johnson*, 322 F.3d 863, 866 (5th Cir. 2003)); *Lane v. Harris Cty.Med.Dep't*, No. 06-20935, 2008 WL 116333, at *1 (5th Cir. Jan.11,2008)( under the PLRA, "the prisoner must not only pursue all available avenues of relief; he must also comply with all administrative deadlines and procedural rules"). Indeed, "a prisoner must now exhaust administrative remedies even where the relief sought – monetary damages – cannot be granted by the administrative process." *Booth v. Churner*, 532 U.S. 731, 739 (2001).

The requirement that claims be exhausted prior to the filing of a lawsuit is mandatory. *Gonzalez v. Seal*, 702 F.3d 785 (5th Cir. 2012). "Whether a prisoner has exhausted administrative remedies is a mixed question of law and fact." *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010). As "exhaustion is a threshold issue that courts must address to determine whether litigation is being conducted in the right forum at the right time, . . . judges may resolve factual disputes concerning exhaustion without the participation of a jury." *Id*. at 272. A prisoner should face a significant consequence for deviating from the prison grievance procedural rules:

> The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance. The prison grievance system will not have such an opportunity unless the grievance complies with the system's critical procedural rules. A prisoner who does not want to participate in the prison grievance system will have little incentive to comply with the system's procedural rules unless noncompliance carries a sanction . . . .

*Woodford* at 95.

Mississippi Code Annotated § 47-5-801 grants the Mississippi Department of Corrections the authority to adopt an administrative review procedure at each of its prisons. Under this statutory authority, the Mississippi Department of Corrections created the Administrative Remedy Program ("ARP") through which an inmate may seek formal review of a grievance relating to any aspect of his incarceration. This court approved the ARP Program in *Gates v. Collier*, GC 71-6-S-D (N.D. Miss. Feb. 15, 1994).

The two-step ARP process begins when an inmate first submits his grievance in writing to the prison's Legal Claims Adjudicator within thirty days of the incident. *Howard v. Epps*, No. 5:12CV61-KS-MTP, 2013 WL 2367880, at *2 (S.D. Miss. May 29, 2013). The Adjudicator initially screens the grievance and determines whether to accept it into the ARP process. *Id.* The screening phase operates

as a filter – applied before the formal grievance process begins – to remove procedurally defective or otherwise invalid grievances.

 As set forth above, a prisoner cannot satisfy the exhaustion requirement by filing a procedurally defective grievance or appeal. *Woodford, supra.* Hence, rejection of a grievance during the screening phase terminates the grievance – and does *not* count as exhaustion of the grievance process. *See Seales v. Shaw*, No. 5:15-CV-59-KS-MTP, 2016 WL 616749, at *3 (S.D. Miss. Jan. 26, 2016), *report and recommendation adopted sub nom. Seales v. Wilkinson Cty. Corr. Facility*, No. 5:15-CV59-KS-MTP, 2016 WL 616385 (S.D. Miss. Feb. 16, 2016) (finding rejection during initial MDOC screening process not to constitute exhaustion); *Goldmon v. Epps*, No. 4:14-CV-0112-SA-SAA, 2015 WL 5022087, at *3 (N.D. Miss. Aug. 24, 2015) (same); *see also Robinson v. Wheeler*, 338 Fed. Appx. 437 (5th Cir. 2009) (per curiam) (not reported) (upholding Louisiana initial screening provision of prison grievance process). However, if the defects in the original grievance were minor ("technical" or "matters of form") an inmate may submit a corrected grievance within five days of the rejection:

> If a request is rejected for technical reasons or matters of form, the inmate shall have five days from the date of rejection to file his/her corrected grievance.

*See* https://www.mdoc.ms.gov/Inmate-Info/Documents/CHAPTER_VIII.pdf ("Inmate Handbook, Chapter VIII, Administrative Remedy Program") (last visited April 3, 2019)).

 If accepted, the grievance is forwarded to the appropriate official, who then reviews it and issues a First Step Response to the inmate. *Howard, supra.* An inmate may only pursue one grievance at a time; additional requests "will be logged and set aside for handling at the Director's Discretion:"

 If an inmate submits additional requests during the period of Step One review of his

request, *the first request will be accepted and handled*.[6]  The others will be logged and set aside for handling at the Director's discretion.  A maximum of ten requests will be logged.  Requests above that number will be returned to the inmate and not filed.

Inmate Handbook, Chapter VIII, Administrative Remedy Program, VII(A) (emphasis added).

If the inmate is unsatisfied with the First Step response, he may continue to the Second Step by completing an appropriate grievance form and sending it to the Legal Claims Adjudicator.  *Id.*  The Superintendent, Warden or Community Corrections Director will then issue a final ruling, or Second Step Response – which completes the ARP process.  *Id.*  Issuance of the Second Step Response is the one of two ways to complete the grievance process.[7]  If the inmate is unsatisfied with that response, he may file suit in state or federal court.  *Id.*

The Inmate Handbook requires that a grievance "present as many facts as possible to answer all the questions who, what, when, where, and how concerning the incident."  *See Pinkton v. Jenkins*, 2019 WL 1089087, *3 (N.D. Miss. 2019).  Although a plaintiff is "not required to present specific legal theories in his grievances, . . . he [is] required to provide facts and to alert prison officials of the problem in order to give them an opportunity to address it."  *Johnson v. Johnson*, 385 F.3d 503, 517 (5th Cir. 2004).  "[T]his portion of [MDOC's] ARP requires that all officials involved be named or at least referenced in description."  *Holton v. Hogan*, 2018 WL 707544, *3 (S.D. Miss. 2018); *see also Pinkton*, 2019 WL 1089087 at *3

---

[6] Hence, only the first grievance will be accepted; while it is pending, any subsequent ones will be backlogged.  The grievance process will not begin for the second grievance until the first grievance has been resolved.  Likewise, the process will not begin for the third grievance until the second has been resolved, and so on – until no more grievances are backlogged.

[7] Though not relevant in the present case, the grievance process may also be deemed complete if 90 or more days pass without a resolution to the grievance.  *See* Inmate Handbook, Section VIII, Paragraph (VIII(A)).  Burrage filed the instant case on August 25, 2022 – only thirty-two days after July 24, 2022 (the day he first attempted to initiate a grievance regarding the alleged assault).

(dismissing claims against two defendants for failure to exhaust administrative remedies where plaintiff never filed grievance regarding the actions of the two defendants).

**For Allegations of Sexual Assault, a CID Investigation Must
Be Completed Before Initiating the MDOC Grievance Procedure
Through the Administrative Remedy Program**

Sexual assault allegations graft an additional layer of review onto the ARP grievance process. Because of the serious and sensitive nature of sexual assault allegations, MDOC requires that CID conduct an investigation *before* an inmate may seek relief through the Administrative Remedy Program grievance process.

> MDOC takes all PREA claims very seriously. *All initial PREA allegation letters received by ARP will be forwarded to the CID Director for review.* The offender will be sent a letter by ARP notifying him/her that the allegation has been sent to CID for review. The letter will also state that ***upon completion of the investigation by CID***, *if the offender is unsatisfied with the results, he/she may initiate a request that the allegation be considered by ARP.* If the offender subsequently submits a request to ARP with proof of review completed by CID regarding the PREA allegations, a case will be opened as an Emergency ARP at the Second Step and be forwarded to the appropriate PREA Coordinator for a response. If an offender feels he is subjected to emergency conditions, he must send an emergency request to the ARP Director. The ARP Director will immediately review the request and forward the request to the level at which corrective action can be taken. If the MDOC ARP Director agrees that the complaint in an emergency, he/she will accept and respond to the complaint. If he/she does not agree that the complaint is an emergency, he/she will advise the offender in writing. The offender will then have five days from the date the rejection memo is received to submit his request through regular channels (beginning with the First Step if his complaint is acceptable for processing in the Administrative Remedy Program).

Ex. 1, SOP 20-08-01 (emphasis added). Thus, under SOP 20-08-01, because Burrage alleged that he was sexually assaulted, his allegations were forwarded to CID on October 3rd, and he could not even *begin* the grievance process until that investigation was completed. *Id.* Further, even if he had initiated the post-investigation grievance, it would have been forwarded to the PREA Manager for a response, and, back in July, she had already found the allegations to be unfounded. Nonetheless, that is the path Burrage was required to follow to complete the grievance process for sexual assault allegations, and he did not do so.

- 12 -

**MDOC's Disjointed Response to Burrage's Requests to
Be Separated from His Alleged Attacker**

Burrage sought to be separated from his alleged attacker – either through the "Red Tag" process or a transfer to another facility.  In the instant case, however, MDOC officials seem to have suffered from a case of "the left hand not knowing what the right hand was doing."  For several months Burrage's requests for relief were either lost or shuffled from one desk to another.

Burrage sought relief (separation from his alleged attacker) from many sources:  the Administrative Remedy Program[8], his Case Manager[9], the PREA Manager[10], Corrections Investigation Division[11], Mental Health Services[12], and Medical[13].  Yet, though these authorities (except for the ARP) received notice of the alleged attack in July, he was not transferred until November.

The response to Burrage's initial ARP grievance was flawed; somehow, the ARP did not receive the grievance when he sent it the first time in July.  Doc. 57-1 at 5.  PREA received timely notice from medical, investigated, and notified CID.[14]  CID did not investigate until October (when the ARP made the referral after Burrage resubmitted the July 24th grievance).[15]  Mental Health Services had notice of the allegations on July 26, 2022, and stood ready to provide crisis counseling.[16]

---

[8] Doc. 57-1 at 1.

[9] Doc. 57-1 at 11.

[10] Ex. 2.

[11] Doc. 57-1 at 7.

[12] Doc. 52-4 at 4.

[13] *Id.*

[14] *Id.*

[15] Doc. 57-1 at 7.

[16] Doc. 52-4 at 4.

Burrage's request for medical transfer was redirected to Offender Services, which informed him on October 24th that it would be forwarded again to MSP Classification. Doc. 57-1 at 8.

At some point, Burrage asked his Case Manager for a "Red Tag" so he could be kept separate from his alleged attacker, then followed up on the request in mid-October – yet the Red Tag was not entered into the system. Doc. 57-1 at 11. His Case Manager responded, "You need to speak with someone in Security about moving." *Id*. He filed a second grievance October 3, but was informed that it was premature – and that he must wait until the CID investigation was completed and file another one (as set forth in SOP 20-08-01). Doc. 57-1 at 7. However, CID had been informed of the incident back in July, but apparently did not investigate (apart from the PREA investigation) at that time.[17] *Id*. His third grievance was rejected because he had one or more grievances already pending. Doc. 57-1 at 12. He was finally transferred and relocated to another facility on or before November 28, 2022. Docs. 33, 57-1 at 12. It is not clear whether he was transferred as a result of the sexual assault allegations or for some other reason.

Ultimately, the loss of Burrage's July 24th grievance was the primary source of delay in his being transferred. From Burrage's perspective, other officials responded right away (medical treated him; the PREA Manager investigated; mental health stood by for crisis intervention; CID was involved, etc.), so he waited for a response to his grievance from the ARP Director. Then, when Burrage inquired about the status of his grievance on September 26th, some two months later, he discovered that his grievance never even made it to the ARP Director. When it finally did reach the ARP Director on October 3rd, the Director was required under SOP 20-08-01 to forward it to CID for investigation, and he did so. But, under SOP 20-08-01, the ARP grievance process could not even

---

[17] The PREA Manager is under the authority of CID. Ex. 2.

*begin* until after the October CID investigation was complete. Burrage was transferred to another facility on or near November 28th, and, though possible, nothing in the record shows that CID completed its investigation before that transfer. Thus, due to the mishandling of his initial grievance – and despite the passage of time – the ARP grievance process for Burrage's allegations never even started.

Finally, after Burrage's transfer, the ARP Director sent him a letter on December 8, 2022, stating that the issue had been resolved:

> ARP is in response to your *correspondence*[] [referring] to a transfer due to conflict with staff and inmates. Your request has been granted, you are now housed at the Marshall CCF. Therefore, your request is being filed.

Doc. 57-1 at 14. Notably, the ARP Director responded with a letter (rather than a Second Step Form) – and referred to Burrage's requests as "correspondence" – not his "ARP" or "grievance," confirming that, despite several attempts, Burrage had never actually initiated the grievance process.

### Burrage Did Not Exhaust His Administrative Remedies Before Filing Suit

Though MDOC's responses to Burrage's repeated requests for assistance from the ARP and other arms of MDOC were out of sync, the outcome of this case is clear. As noted above, the plaintiff simply did not complete the grievance process before filing the instant suit, a fact he has acknowledged. *See* Doc. 26. First, as set forth above, though he attempted to initiate the grievance process, under MDOC SOP 20-08-01, CID had to investigate his allegations before the grievance process could begin. He was required to wait until the conclusion of the CID investigation before he could initiate a grievance on the matter. MDOC SOP 20-08-01. In this case, he did not initiate a grievance after the CID investigation concluded (and it appears that the investigation concluded, if at all, after Burrage had been transferred to another facility – and long after he had filed the instant suit).

Even if the ARP Director had received Burrage's July 24 grievance and started the process that day, Burrage did not complete either path of the grievance process: (1) He did not obtain a Second

- 15 -

Step Form (one way to complete the grievance process), and (2) He filed suit before the 90-day deadline to complete the grievance process had expired (the other way). *See* Inmate Handbook, Section VIII, Paragraph (VIII(A)) (ARP grievance process deemed complete if issue not resolved within 90 days). Burrage filed the instant case on August 25, 2022 – only thirty-two days after July 24, 2022 (the day he first *attempted*, but failed, to initiate his grievance). He submitted his other grievances *after* the instant case was filed; as such, even if he had completed the process as to those grievances, none of them would constitute exhaustion of administrative remedies as to the present case. As Burrage did not exhaust his administrative remedies before filing suit, the instant case must be dismissed without prejudice. *See Gonzalez v. Seal*, 702 F.3d 785 (5th Cir. 2012).

### Conclusion

For the reasons set forth above, the instant case will be dismissed. The court ordered the plaintiff to show cause why Mississippi State Prison, all of C.I.D., and Superintendent Marc McClure should not be dismissed from this case. He did not do so; as such, those defendants will be dismissed with prejudice from this case for failure to state a valid § 1983 claim against them.

The motion [52] by defendants Sargent Bradford, Officer Douglas, Renita Hands, and Mr. Honeycutt for summary judgment will be granted, and they will be dismissed without prejudice from this case for failure to exhaust administrative remedies.

Further, in the alternative, though Warden Munford, Mississippi State Prison, all of C.I.D., and Superintendent Marc McClure have not been served with process, they will be dismissed without prejudice, as they likewise benefit from the defense of failure to exhaust administrative remedies.[18]

_____

[18] Where a defending party shows that a plaintiff has no cause of action, the defense also benefits an unserved or defaulting defendant. *Lewis v. Lynn*, 236 F.3d 766, 768 (5th Cir. 2001).

In light of this ruling, the remaining motions [23], [24], [25], [26], [30], [36], [43], [47], [48], [55] pending in this case will be dismissed as moot.[19] A final judgment consistent with this memorandum opinion will issue today.

**SO ORDERED**, this, the 27th day of June, 2023.

/s/ David A. Sanders
DAVID A. SANDERS
UNITED STATES MAGISTRATE JUDGE

---

[19] Doc. 36 is the plaintiff's motion to hold the defendants in contempt for failing to provide him with discovery. As the defendants provided the discovery shortly thereafter, the motion [36] is now moot.